Good morning. May it please the Court, my name is Todd Freedman. I'm representing the appellant David Seals-McClellan, who is also present at the Council table with me currently. Your Honors, this is a copyright case involving two works of literature. My client's work, The Single Allegorical Adventures of Eddie, The Existential Ants, which is also referred to as Eddie, and the appellee's work, Ants, which was in July of 2001, the District Court denied DreamWorks' summary judgment as to the essential elements of proving a copyright infringement case, which was substantial similarities and access. Essentially, the District Court found that my client had passed the Ninth Circuit's extrinsic test, meaning that there were material issues of fact surrounding whether both works were similar in plot, themes, character, and the extrinsic test. The District Court also found that by denying the summary judgment motion that a material question of fact did present itself as to whether the defendant's DreamWorks and Nina Jacobson, the alleged creator of Ants, had a reasonable opportunity to view the work in question. Subsequently, a little over a week before trial, the District Court reversed that order and granted defendants motion for alleged new facts. The first fact being Chesterfield's dismissal from this action as a contributory infringer, Chesterfield being the entity that my client submitted his work, Eddie, to. The second fact being the alleged recanting of our similarities expert, Mr. Stanford Whitmore's in the basis for striking similarities opinion. The third fact being additional testimony by former Chesterfield employees, Cat Williams and Stephen Grant. And finally, the testimony of a Chesterfield winner, Yannick Murphy. May it please the Court, I submit to you that these alleged new facts in no way should have disturbed the original denial of the summary. But does it matter to us now? We have the case in front of us as a whole, and we're not limited, are we, to those particular facts to decide was it right to reconsider? We have a summary judgment in front of us now. The issue before us is consider the collective body. Is there enough to sustain summary judgment? Absolutely, Your Honor, but I did want to address those facts because it seemed to be the basis for the Court's decision. The Court did reconsider its summary judgment based on those four factors. However, yes. It certainly can, but we're not even limited to the grounds the judge made a summary judgment ruling on. Absolutely not, Your Honor, and I do invite discussion on the essential elements of this case, reviewing de novo, which is access and substantial similarities. If you look at the facts of this international, which is a Ninth Circuit 1981 case, the Court found in Kumar that access is established when a plaintiff submits his work to an intermediary that has dealings with the defendants. In this case, that's exactly what we have, but we have more than that. In this case, my client submitted his script to the Chesterfield Film Company, which was created by Amblin, the corporate predecessor of the defendant Dreamworks. Created or supported? I would say created, Your Honor. They funded it. They housed it on their lots. They gave it all its money. They provided it with executive mentors, such as the appellant, Anita Jacobson, to review works and to mentor the actual Chesterfield winners. Without Dreamworks' money or Amblin's money, Chesterfield could not have existed. Chesterfield wasn't just an intermediary. It was actually an extension of Amblin, which later turned into Dreamworks. Again, there was this first look deal between Chesterfield and Amblin. Amblin had the scripts that passed through Chesterfield, any scripts that were submitted to Chesterfield. Amblin had a first look option to produce those scripts. The purposes of Amblin funding and spending hundreds of thousands of dollars a year on Chesterfield was access to these scripts. Amblin and Universal, they were in the business of making movies. on scripts they received each year or to a more limited number than that? I'm sorry, Your Honor? Well, as I understand it, numbers up as large as 4,000 stories a year were submitted to the Chesterfield project. Are you telling me that all 4,000 stories were turned over to Amblin? We don't know if all four of those stories were turned over to Amblin, but we do know that based on the Chesterfield agreement with Amblin, where the scripts and drafts of scripts submitted to Amblin and the proposals. The Chesterfield proposal, when Chesterfield was courting Amblin and Universal, when they were indicating that Amblin and Universal shall have a first look at all scripts which passed through Chesterfield, we don't know which scripts made it to Amblin or made it through Chesterfield to Universal, but we have Nina Jacobson, who certainly had a relationship with Chesterfield, where my client submitted his screenplay, Eddie, to. And subsequently, and DreamWorks alleges coincidentally, she came up with a strikingly and substantially similar piece of work. It's my understanding that these first look Is that correct? It would depend on what context. In this type of context, when you have a writing contest, which is being funded by Amblin and by Universal, the consideration for that funding was this first look deal. It might be standard in the industry, but in this case, it was very important. It was the Without this first look deal, Amblin and Universal would have had absolutely no motive to spend the money to support this program. They were getting something monetarily tangible out of this, the opportunity to have works, to make into movies. Do you want us to hold that as a matter of law, once there is this first look arrangement, then there's access to whatever is submitted regardless of what other proof there is? Your Honor, I think what I'm asking you to hold as, based on all the facts submitted in this case, that there was a material question of fact as to whether defendants Nina Jacobson and DreamWorks had a reasonable opportunity to view the work. I'm certainly not asking you to hold it as a matter of law. But what's the disputed fact? There's many disputed facts in the case. What's the disputed fact on the Chief Judge's question that shows reasonable access? Well, if you look again at the Kamar case, Kamar states when a plaintiff submits his work to an intermediary that has overlapping business interests or interests with the defendant, access is established. And that's exactly what we have in this case. That's not a disputed fact. That's a question of law. That is a question of law. There are other disputed facts in this case. The first look deal, for example, Chesterfield's supposed stringent policies on scripts leaving the compound, it's the disputed fact as to Chesterfield's lax business procedures. Did you have any discovery in this case before the summary judgment? Which summary judgment were you speaking of, the summary judgment granting Chesterfield's summary judgment or DreamWorks' summary judgment? DreamWorks. Sure, there was discovery that was conducted. Did you have testimony of Ms. Jacobson? Yes, Ms. Jacobson in her interrogatory stated that she not only had no involvement with Chesterfield, but she had no involvement with any screenwriting contests in general. Okay, so was there any evidence that anyone at DreamWorks had, any evidence that came out from your discovery that anyone at DreamWorks had access to the EDDI script? Sure. The standard for access is a reasonable opportunity to view. And based on Nina Jacobson's relationship with Chesterfield, based on the fact that when she was a Universal Development Executive, her offices were right across from Chesterfield's offices, based on the fact that she lied in her interrogatory responses, first denying any involvement with Chesterfield or screenwriting contests in general, and subsequently Chesterfield founder Ken Orkin testified that she was in fact an infringer, then Nina Jacobson did admit that she was involved with Chesterfield. Chesterfield's proximity to her offices certainly creates a material question. She mentored somebody who successfully got through the Chesterfield program, was one of the ten or so chosen one year. That's not the same as saying that she's Chesterfield or has access to everything that comes into Chesterfield. That's what she stated. I think what we're really talking about here is the difference between reasonable opportunity and bare possibility, to use the phrases that have been acknowledged in your brief. And when you wind up arguing, as you have in your brief, that Chesterfield gets something like 4,500 scripts a year, but they weren't careful and put rejected scripts in the recycling bin, I have a hard time seeing an executive from DreamWorks pawing through the recycling bin to see what might be there. But that's sort of what you left us with. Well, again, Your Honor, the standard is not how they got to view the script. It's reasonable opportunity, not bare possibility. And if you're telling me that they might have gone through the recycling bin, that kind of screams out bare possibility, but not likely to have happened. I'm not alleging that they might have gone through the recycling bin. What I'm stating is that we've got this Ninth Circuit standard of law under Kamar. And based on that standard of law, my client submitting his script to Chesterfield, which was an intermediary of both New Jacobson and DreamWorks, establishes access under what the Kamar standard is. Let me tell you what bothers me a little bit about your theory, and then you can address it any way you want. I'm concerned with the idea that if somebody's a mentor to an organization, that that person and their organization is charged with all the knowledge that the organization had to which they acted as a mentor. So, for example, if you or your law firm agreed to be a mentor for law students in a clinic at a major law school in Los Angeles, would you be charged with knowledge? You're a mentor. You're going to help one student. Are you charged with knowledge of every case that's in the clinic? I don't know if I would necessarily be charged with actual knowledge of every case. Would your law firm be held to have access to all the information that University of Southern California had, where you volunteered as a mentor? If that's the law, we're not going to have law firms acting as mentors, that's for sure. Your Honor, I understand the point you're making, but I think that each access case presents its own question of facts. If I understand, why is this different if she was in a mentor role? What was there about Ms. Jacobson's role that makes her different than the lawyer who's a mentor to a law student? Sure. If we look at the history between Chesterfield and Universal and Amblin, they assigned all of their top executives to mentor and to have involvement with Chesterfield so they can make sure that scripts were regularly coming in and out and that there were access to the case and you also add the inverse ratio rule, if you look at all the similarities in this case, the similarities between Eddy and Anse, certainly the standard for access lowers in light of the striking substantial similarities in this case. I was going to ask just what the Chief said. I'm sorry? Let's talk about similarity then. Okay. We've got two works about anthropomorphic ants who have a series of adventures and there are a couple of similar things like there's a magnifying glass and something else, but what else? Other than that, the works seem to be quite different. Well, Your Honor, I would respectfully say that. Well, what is similar beyond the fact that you've got anthropomorphic ants who have adventures and a couple of the adventures are similar? Sure. Well, I think what you're doing is listing out a few similarities and I think that first of all, when the summary judgment was denied, the court had stated as a matter of law that the extrinsic test was passed and the court had found that both works were substantially similar in plot, themes, characters. Why don't you get into the specifics of them because at this point when there's a summary judgment, I don't really care what the court said earlier, I just want to analyze the similarities. Well, first of all, we have Eddy and we have Zee. They're two highly individualistic ants that are sort of against or at odds with their colonies. They espouse individuality and their colonies espouse conformity and there's major conflicts with both ants against their colonies. Also, we have the antagonists. We have similar antagonists in both scripts. We have Christian and Mandible, supposed generals enforcing the colony rules and there's major conflicts between Christian and Mandible. Subsequently, both Eddy and Zee sort of mistakenly escape from the colonies, get into adventures outside of the colonies where they're both attacked by a boy with a magnifying glass. They both find these monoliths or these utopias outside the colonies. Other than a love interest in ants and a Hollywood ending, to me these plots are very similar. The characters of both Zee and Eddy, as espoused by Stanford Whitmore, who was a WGA arbitrator and screenwriter for over 45 years and not only an arbitrator but an arbitrator's advisor, he's at the top of the WGA. He reviewed both works and he found that both characters were not only substantially similar but strikingly similar. He found that how could you have these two fables where two ants have these midlife crises and have these conflicts with their colonies? So certainly, not only is it my opinion that these works are substantially and strikingly similar, Mr. Whitmore also had the exact same opinions. How do you explain A Bug's Life, which comes out a few months later from Pixar? Suddenly you've got another adventure with insects going out into the outside world. Is that also the same thing? A Bug's Life, in my opinion, is a completely different work than Ants and Eddy. The only similarity between A Bug's Life and Ants and Eddy is that it's a cartoon about bugs. Your Honor, I know that I only have two or three minutes left. I'd like to take some time for rebuttal. If there's any other questions I can answer them at this time. Thank you. Good morning. I'm Louis Petrich, appearing for DreamWorks and Nina Jacobson, together with my partner, David Aronoff. I want to respond to a couple of the questions posed by the panel, if I could, to clarify. First of all, Judge Clifton asked about the grounds, I think, stated by Judge Hatter. Judge Hatter never stated any grounds in any of the motions. He either said granted or denied, so that really doesn't help us. Secondly, there's a great deal of confusion about the first look notion here. Counsel is, when he tells the court that DreamWorks had the right contractually to a first look to all 4,000 scripts, he's relying on a statement that was made by Chesterfield in an earlier proposal, which, by the way, was stricken from the record by this court on October 13th of this year. So that's not even before the court. That was in some kind of a prospectus by Chesterfield. What is before the court is the agreement, the written agreement, between Chesterfield and Universal and Amblin, which says that each year there will be 10 participants who are determined to be the winners of the contest for the year. They will be mentored. They will be given a stipend of $20,000 a year, and that stipend would be funded by Universal and Amblin. And then after they become mentors, they – I'm sorry, after they become assigned to mentors, then they're assigned to write two new scripts. The mentors never see the applications. They could care less. They're interested in teaching or seeing if these writers, many of them writers from other fields, might become screenwriters, might be able to do it, and so they're taught for a year how to write screenplays, and the mentors only see the two screenplays that they write while they're in the program. They don't see any of the 4,000 scripts. There's no basis for that in the record. So I think that goes to what Judge Schroeder was asking about. Judge Gould asked about discovery. There are 20 depositions in this case. Everybody that had anything to do with anything at Amblin, Universal, DreamWorks, were all deposed. There was nothing in the record to show anything contrary to what I've said. There was nothing to show that Nita Jacobson was hanging around the Chesterfield bungalow. Counsel said that she was just across the way. Well, the record is that she was 500 yards away, five football fields away, in a Universal City studio lot, which has hundreds of buildings. The testimony was that when she did her mentoring of Ms. Oney, she did the mentoring at her own office in the Black Tower, 500 yards away from Chesterfield. All she ever saw were the two scripts that Ms. Oney prepared under the program. And there shouldn't be any confusion about this. This is in the supplemental excerpt of record at page 81. We have an admission by the plaintiff in our RFAs in which they admit that she was 500 yards away. So I don't understand how counsel could say that Ms. Jacobson was just across the way. What he says in some of his briefs is that a woman named Kate Williams, who was at Chesterfield, said a friend of hers who she thought was in development was just across the way. Later in her deposition, she said this friend of hers was not a part of Universal. She was on the lot at Universal working for another development company. And that's what he refers to. It somehow confuses that woman with Ms. Jacobson. The recycling bin, there's no evidence that there was anybody taking things out of the recycling bin, and I don't want to belabor that. I think there is no basis to find that there is a reasonable possibility for the people who created ants to have access to the plaintiff's work. The Kamar case doesn't help the plaintiff. In Kamar, you had two makers of softer plush toy animals. The plaintiff created the designs and had Korean contractors manufacture them. The defendant didn't create its own designs, but went to the Korean manufacturers and bought the plush toys. The defendant bought the plush toys from three of the manufacturers for the plaintiff. So there was obvious access. They were probably buying the same thing that the intermediary had created for the plaintiff. That doesn't help the plaintiff at all in this case. There is, of course, an independent basis for affirming the summary judgment apart from the access or copying issue, and that is that the works are just not substantially similar, and they're not similar in the protected expression. And that, as we point out in our brief, is an issue of constitutional dimension. First of all, we have to decide whether what they are claiming is infringed merits copyright protection. Is there originality? Is it expression and not idea? And here, what we've heard is that these are stories about two individualistic ants. And I do want to comment on one thing. In Plaintiff's opening brief, he states that Ms. Jacobson pitched an idea to her boss at DreamWorks regarding, quote, an animated story about a highly intelligent and individualistic ant having a midlife and existential crisis due to living in a colony where his individual needs for meaning was negatively valued. That's in quotes. You would think, by reading that, that that's what Ms. Jacobson said. But when you look at the record, she didn't say that at all. She said she pitched to her boss a story about an ant who was an individual. Well, if you're going to do a story about an ant, you could have an ant that conforms, and then you just, I don't know, give them different colored hats so you know which one it's about. I want to see it again. But if you're going to tell a story about a character and you want the character to stand out, you make them individual. But the important thing about that quote is that Plaintiff wants the court to believe that the defendants think that their work is about an existential ant The movies before the court, I don't think that the Woody Allen ant is having a midlife crisis. He's neurotic, just as Woody Allen is in every movie he's ever been in. But anyway, that's the kind of, unfortunately, that's the kind of abstracting that goes on when parties trying to make two works seem similar that are not. If someone had asked you what the plaintiff's work was about and what the defendant's work was about, I cannot see how anyone would describe them as being the same, or substantially the same. What they have that is similar is that they're both about ants, and they're ants who have anthropomorphic aspects. But since Mickey Mouse, we've come to know about animals who have human characteristics. There aren't very many left, are there? I was trying to think of, maybe there's a termite? I don't know. There's an Adam ant. I grew up on Adam ant. There was an Adam ant in the cartoons 20, 30 years ago, 40 years ago. But the point is that these ants couldn't be more different in the world of the plaintiff's ant. They're just ants that happen to be an ant who thinks and sees human activity and makes an analogy between human activity and ant life and makes some kind of comment on that. In the defendant's work, these are ants who wear helmets. They wear human costumes. They dress up like humans. They act like humans. They have signs in their tunnels. It's a fantasy world. They're completely different kinds of stories. The laundry list, we've heard that the character Christian in the plaintiff's work is just like the general patent type ant in our work, Mandible. Was your work supposed to be a comedy? Yes, we hope it is. Yes, it's a comedy throughout. But I think the plaintiff's work is meant to be somewhat serious. I mean, that's a pretty ponderous title, an allegory about an existential ant. And it tends to be serious. I know they say that he wisecracks a couple of times, but that doesn't turn it into a comedy. I think ants really is a comedy. And the characters Christian and Mandible couldn't be more different. Christian, we're told, is a messenger of the queen. And Christian just serves the function in his story of telling Eddie what the queen's rules are. But in ours, Mandible is this fascist general who's trying to take over the colony and has some notion of what we would call genocide. Do you think patent is in that same category? No, I wouldn't say general patent is, but he certainly modeled after general patent in the way he's bearing. I think even the voice was intended to be kind of remind you of that. Obviously, we're not trying to say that they're the same people. Or Hollywood version of patent in any way. Right. But I think what it conjures up is that that scene in the opening scene in the in the biography movie, Patton, where you see George C. Scott standing in front of the flag and giving this big oration. And I think that's what it was intended to do. Other than a love interest, they're completely they're all very much alike. Well, the love interest is a big part of the ants movie. That's what changes the Woody Allen ant from a character who's incompetent, who doesn't care about his community. I think. All right. And as far as I do want to comment on their expert Whitmore, we've we've shown that he did mouth the word striking similarity. He did that in his original his original declaration when we lost our first summary judgment. It was only later we took his deposition. And so often happens in these cases. You try to find out what's behind the the the the expert saying, yes, they're strikingly similar. You find out that they can't really give the opinion they need to give to support that that statement. Striking similarity is a term of art in this business. And it means that kind of similarity that can can not be explained even by the possibility of independent creation or coincidence or reliance on prior sources, common sources. And and this expert couldn't do that five, four times, at least that we show in the record. When I asked him, are you saying then that ants could not have been written unless it was copied from the plaintiffs work? And he said, no, I can't say that. He had a strong feeling that they were one derived from the other. But that's doesn't support a finding of striking similarity. Thank you. I just like to respond to a few points on the similarities. I don't know if the court had a chance to view the similarities tape where we were able to literally break down portions of ants. And break down portions of Eddie. But under the extrinsic test, again, it's my contention that we've clearly passed that test. Nowhere else are you going to find two ants both waking up, hating their lives, hating their places in the colony. Both ants, again, espouse individual individuality. You've never seen two characters so similar that are ants before ever. Well, can you imagine any movie character as the protagonist espousing? I'm the same as everybody else. I mean, movies inherently draw individual characters that are different. I don't think that you've ever found two ants waking up again. The focus is on ants. Once you get past the creature. I watched the tape. I didn't find him that similar. Because because your client's story, frankly, is is meant to be serious. Almost kind of a downer in terms of he's he's free when he's fluffing up in the air. How he's going to land or survive. That really doesn't matter at any point. And ants with the Z, the movie, that's a Woody Allen comedy. Like every other Woody Allen comedy. What's the similarity other than the fact the creature's an ant? Well, they're ants and they're both again, they're both at odds with their colonies. They both are the same protagonists going against the same two antagonists. Again, we we have Christian and Mandible. Mandible, again, is a general second commander, the queen, the queen's messenger. The same way we have Christian, who is also a messenger of the queen. And those are that's two very similar conflicts. We have the two same protagonists going against conflicting with the two same antagonists. Christian antagonizes Z, excuse me, antagonizes Eddie through. What do you want to respond quickly to the to your adversaries characterization of your expert witnesses testimony? Yes, Mr. Whitmore testified that there were similarities in plot, theme, character, tone, setting and pace. He clearly presented a question of fact as to whether these were similar. Again, Mr. Whitmore's credentials. He's been an arbitrator for 45 strikingly similar. He did find one major strikingly striking similarity. You've got two aunts in a fable having this midlife crisis, waking up, hating their lives. And, again, he didn't recant his testimony. He said when Mr. Patrick asked him questions, he said anything in the realm of possibilities is possible. But in my opinion, these works were strikingly similar. Independent creation was precluded.  The case just argued is submitted for decision. We'll move to the next case, which is.
judges: Schroeder, Gould, Clifton